UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY RAY BAKER,<br><br>Plaintiff,<br><br>v.<br><br>J. MACOMBER, et al.,<br><br>Defendants. | No. 2:15-cv-0248 TLN AC P<br><br>FINDINGS AND RECOMMENDATIONS |

I. Introduction

Plaintiff is a state prisoner incarcerated at the California Substance Abuse Treatment Facility (CSATF) in Corcoran, under the authority of the California Department of Corrections and Rehabilitation (CDCR). Plaintiff proceeds pro se with this civil rights action against sole defendant California State Prison Sacramento (CSP-SAC) Correctional Officer J. McCowan, on claims of excessive force and deliberate indifference to plaintiff's serious medical needs. This action proceeds on plaintiff's original complaint. See ECF No. 1.

Pending before the court are the parties' cross-motions for summary judgment. See ECF Nos. 54, 71. These matters are referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(c). For the reasons that follow, this court recommends that defendant's motion be granted in part and denied in part, and plaintiff's motion be denied in full. As a result, this case should proceed to trial.

1

II. Background

Plaintiff filed his complaint on January 25, 2015.[1] ECF No. 1. The court granted plaintiff's application to proceed in forma pauperis and screened the complaint pursuant to 28 U.S.C. § 1915A. The court accorded plaintiff the option of proceeding on his original complaint against sole defendant McCowan, or filing a First Amended Complaint in an attempt to state cognizable claims against additional defendants. ECF No. 10. Plaintiff elected to proceed on his original complaint and submitted the information necessary for the U.S. Marshal to serve process on defendant McCowan. Defendant answered the complaint on December 29, 2015. ECF No. 20.

In his complaint, plaintiff alleges that on the afternoon of August 10, 2012, he entered CSP-SAC's Facility C medical clinic to obtain his 3:00 p.m. insulin injection. Plaintiff exchanged an Islamic greeting with another inmate who was in a holding cell. Correctional Officer Snipes told plaintiff that he was not to talk with the other inmate and to "take it down the hall." ECF No. 1 at ¶ 9. Plaintiff objected to Snipes' "disrespectful tone and manner," and they exchanged words. Id. As plaintiff proceeded to take a seat in the clinic, defendant McCowan rushed in and told plaintiff to "stand up turn around face the wall and cuff-up." Id. at ¶ 14. Plaintiff told McCowan that he had a medical chrono authorizing only frontal waist restraints but defendant insisted that plaintiff cuff-up behind his back and then "fastwalked" plaintiff out of the clinic toward a holding cage, initially out of view of other officers and cameras and "raised the arms up midway passed [sic] plaintiff's back. Beyond their designed capacity." Id. at ¶¶ 17, 18. Defendant placed plaintiff in a holding cage "on the farthest side of the sally port" and removed his cuffs. Defendant ignored plaintiff's complaints of pain in his left shoulder and wrists but another officer escorted plaintiff to the clinic where he was examined and a Medical Report of Injury completed. Id. at ¶¶ 18-21.

---

[1] Plaintiff's filing dates are based on the prison mailbox rule, pursuant to which a document is deemed filed or served on the date a prisoner signs the document and gives it to prison officials for mailing. See Houston v. Lack, 487 U.S. 266 (1988) (establishing prison mailbox rule); Campbell v. Henry, 614 F.3d 1056, 1059 (9th Cir. 2010) (applying the mailbox rule to both state and federal filings by incarcerated inmates).

Plaintiff alleges that defendant McCowan used excessive force against him and was deliberately indifferent to his serious medical needs by failing to adhere to plaintiff's frontal waist restraints chrono and by preventing plaintiff from receiving his insulin injection. Id. at ¶ 45.

Defendant filed his motion for summary judgment on March 6, 2017. ECF No. 54. Following extensions of time to resolve newly raised discovery matters and to insure that plaintiff had access to his legal materials, plaintiff filed his opposition and cross-motion for summary judgment on July 24, 2017. ECF No. 71. Defendant replied to plaintiff's opposition, ECF No. 72, and filed an opposition to plaintiff's motion for summary judgment, ECF No. 77. Plaintiff filed an unauthorized surreply, ECF No. 73 and a reply, ECF No. 75, and sought to submit additional evidence, ECF Nos. 76, 79, 81. By order filed December 20, 2017, the undersigned overruled defendant's objections and authorized the court's consideration of all plaintiff's evidence and briefing. ECF No. 83.

### III. Legal Standards for Motions for Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).

Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment ... is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. Moreover, "[a] [p]laintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).[2]

The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a

---

[2] In addition, in considering a dispositive motion or opposition thereto in the case of a pro se plaintiff, the court does not require formal authentication of the exhibits attached to plaintiff's verified complaint or opposition. See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); see also Aholelei v. Hawaii Dept. of Public Safety, 220 Fed. Appx. 670, 672 (9th Cir. 2007) (district court abused its discretion in not considering plaintiff's evidence at summary judgment, "which consisted primarily of litigation and administrative documents involving another prison and letters from other prisoners" which evidence could be made admissible at trial through the other inmates' testimony at trial); see Ninth Circuit Rule 36-3 (unpublished Ninth Circuit decisions may be cited not for precedent but to indicate how the Court of Appeals may apply existing precedent).

reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011) (per curiam). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. … Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

In applying these rules, district courts must "construe liberally motion papers and pleadings filed by pro se inmates and … avoid applying summary judgment rules strictly." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010). However, "[if] a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ." Fed. R. Civ. P. 56(e)(2).

////

////

////

////

5

IV. Facts

Unless otherwise noted, the following facts are undisputed by the parties or as determined by the court. Material factual disputes are noted as appropriate.

- Plaintiff Timothy Baker is an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR).
- At all times relevant to the allegations in this case, plaintiff was housed at California State Prison Sacramento (CSP-SAC) in Facility C.
- At all relevant times, defendant McCowan was a correctional officer at CSP-SAC.
- During third watch on August 10, 2012, defendant was assigned to act as a Health Care Access Escort Officer in Facility C; this was not his regularly assigned post.
- Health Care Access Escort Officers provide, inter alia, escorts of prisoners to and from facility medical clinics.
- When inmates must be escorted to or from a medical appointment, escorting officers are directed to establish whether the inmate has any restrictions prior to the escort. These restrictions include but are not limited to waist restraints.
- On the date of the incident, plaintiff had a permanent "waist restraints" chrono. See ECF No. 71 at 13, 94[3] (Sept. 2011- Sept. 2012 chrono); see also id. at 14 (Feb. 2016 chrono (same)); but see id. at 95 (Nov. 2013 chrono (temporary "frontal or waist chains")).
- Access to CDCR services, programs and activities by disabled inmates is controlled by the Armstrong Remedial Plan[4] which provides in pertinent part, see ECF No. 71 at 22, 24:

> Inmates who have a disability that prevents application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodation, under the direction of the supervisor in charge. Mechanical restraints shall be applied to ensure effective application while reasonably accommodating the inmate's disability.

- On August 10, 2012, plaintiff was escorted to the Facility C medical clinic by officers

---

[3] Page references herein reflect the court's electronic pagination upon docketing, not the internal pagination of the cited document.
[4] See generally Armstrong v. Davis, 275 F. 3d 849 (9th Cir. 2001).

1 | other than defendant to obtain his afternoon insulin injection.

- Defendant avers that he heard yelling between plaintiff and a female officer, so he entered the clinic, handcuffed plaintiff and escorted him to Holding Cage #1. McCowan Decl. ¶¶ 8, 10.

- The parties dispute whether defendant knew plaintiff had a waist restraints chrono. Plaintiff contends that, in addition to plaintiff telling defendant, it should have been clear to defendant that plaintiff was disabled as he "was clearly walking with a cane and had a vest identifying him as [] mobility impaired as disabled," and he carried his medical accommodations chronos at all times. ECF No. 76 at 5. Defendant avers (McCowan Decl. ¶ 8):

> Common practice would be for me to determine whether Baker had any restrictions for his escort. I do not recall Baker telling me that he had a waist restraint chrono. Additionally, I do not recall Baker showing me a waist restraint chrono.

- Plaintiff has submitted three August 2012 declarations by inmate James Davis who avers he witnessed defendant enter the clinic "at a high rate of speed" and go directly to plaintiff, whom he "grabbed and spun around" then forced plaintiff's hands behind his back. Davis avers that this happened without provocation or resistance by plaintiff, whose complaints of pain were ignored by defendant as he forcefully moved plaintiff to a holding cage. Davis avers that plaintiff told defendant he could not cuff up behind his back and had a medical chrono for waist restraints only. See ECF No. 71 at 33-7.

- The parties dispute the nature of their interaction thereafter. Defendant avers that although plaintiff "continually questioned why he was being escorted," defendant "handcuffed and escorted Baker without incident . . . out of the Facility C medical clinic to Holding Cage # 1 outside of the Watch Office on Facility C." (McCowan Decl. ¶¶ 8, 10.) Defendant McCowan avers that, in his "experience, where necessary, even limited mobility inmates can still be escorted with proper bodyweight support, despite being handcuffed behind the back." (McCowan Decl. ¶ 9.)

////

////

7

1      • In contrast, plaintiff testified at his deposition[5] that defendant "fast walked" him out of the clinic, holding plaintiff's right arm, and "veered off to the left out of plain view of everybody and then raised my arms. I felt a pop. I immediately complained about it. I said my arm is messed up. Please get me some medical attention." (Pltf. Depo. at 38:4-8.) Plaintiff testified that the incident took place outside camera range, "towards the law library," after defendant said, "you feel froggy, jump." (Id. at 37:17, 23-5.)

     • Defendant responds (McCowan Decl. ¶¶ 11-3):

> At no time did I escort Baker to an unmonitored area of the prison. Additionally, because of the need for security in the prison, there are no unmonitored areas of the facility. At no time during my involvement in this incident did I pull inmate Baker's hands up to his shoulders, inflicting pain or causing a "pop." Had an incident happened, I am obligated to prepare an incident report describing the situation. Notably, a report was not prepared in this matter.

     • The parties dispute whether the alleged incident occurred outside the view of prison cameras and other correctional staff. Plaintiff testified that defendant took plaintiff out of view of all other staff members and cameras. Pltf. Depo. at 37-39 (citing Pltf. Exs., ECF No. 71 at 44-50).[6] Defendant contends "[t]here is no area on Facility C medical, or near the Program Office, that is unmonitored." DUF 19 (citing Steele Decl., Exs. A-T).

     • Sometime thereafter, Sergeant Andes escorted plaintiff from the holding cage back to the clinic, where plaintiff was examined by Licensed Vocational Nurse (LVN) J. Maalihan.

     • At 3:40 p.m., LVN Maalihan completed a "Medical Report of Injury or Unusual Occurrence," wherein he noted plaintiff's complaints of left shoulder pain but found no objective

---

[5] Further references herein to plaintiff's "testimony" reference his deposition testimony.

[6] See Pltf. Depo. at 37:9-16, 20-24, 39:4-5:
> He . . . took me back out the same door he came in. Right here in the corner, there is – there is a telephone and a stop sign – a red stop sign with white stop on it because – like do not enter this area. he took me out of plain view of everybody because Snipes was still sitting at the desk. Delaney, everybody was still at the far end of the hallway . . . . As we go out the door, he takes me out of the plain view – I will show you. There is a camera there. Ge took me out of view of the camera. Further towards the law library there is no camera there. And he assaulted me in route. . . . He took me to the left, he veered off to the left out of plain sight of everybody.

See also Pltf. Exs., ECF No. 71 at 44-50.

redness, swelling or other injury. (Maalihan Decl. ¶¶ 6-7; id., Ex. A.) Maalihan avers that his "diagnosis did not require any further follow-up by a doctor, but [he] informed Baker to submit a sick-call slip if any other left-shoulder issues arose." (Id. at ¶ 8.)

- The record does not support defendants' assertion that plaintiff had a scheduled follow-up physician appointment for his shoulder later on August 10, 2012 or, therefore, that plaintiff refused it.[7]

- Later on August 10, 2012, plaintiff completed a Health Care Service Request (HCSR) Form (CDC 7362), stating, ECF No. 71 at 7, 74, 93:

> On 8-10-12 Officer C/O McCowan used excessive force by overextending my arms while being cuffed up behind my back with a waist restraint chrono. My left shoulder is in a lot of pain due to it being overextended. Please Ducat Me In ASAP.

The HCSR Form was designated "received" and "reviewed" by a registered nurse on the evening of August 11, 2012. Id.

- On August 13, 2012, plaintiff was evaluated by RN Pambrose. See ECF No. 71 at 7, 58-60, 102. Plaintiff complained of left shoulder pain (at a pain level of "6-7" on an ascending scale of 0 to 10) following an "incident with custody involving handcuffs." Id. at 58. The RN's notes indicate plaintiff's statements that he first experienced shoulder pain in 2007-2008, and that the August 10, 2012 incident with custody exacerbated his pain for a few days but his pain level was "now back to pr [sic] incident." Id. The RN noted that plaintiff had full range of motion with facial grimacing. Id. Plaintiff was already prescribed ibuprofen and gabapentin, and was referred to a physician on a routine timeline.

- On August 29, 2012, plaintiff was again evaluated by a nurse at his request. See ECF

---

[7] The parties dispute whether plaintiff had a scheduled follow-up appointment for his shoulder on August 10, 2012. Defendants rely on the declaration of Dr. Hamkar who reviewed plaintiff's Unit Health Record (UHR) and avers, without citation, it demonstrates that "[o]n August 10, 2012, plaintiff refused a follow-up visit with a doctor regarding his alleged shoulder injury." See Hamkar Decl. ¶ 8; DUF # 13. Plaintiff asserts that on August 10, 2012, his only scheduled appointment was prior to the incident with Dr. Hamkar, whom plaintiff saw "early on for another appointment," resulting in a urine test related to plaintiff's general health. See ECF No. 71-1 at 3 (referencing ECF No. 71 at 54-5, 101). Defendants concede that "plaintiff had an appointment earlier on August 10, 2012." ECF No. 74-1 at 2.

No. 71 at 61, 103. The RN noted plaintiff's complaint of left shoulder pain (at a level of "6") resulting from an injury, and his request for an MRI. The notes indicate plaintiff stated he'd had right shoulder pain for the last "couple years," and left shoulder pain for "2y." Id. Upon examination, the RN noted that plaintiff had a limited range of motion in his left shoulder. The RN noted that a physician appointment was scheduled in September.

- On September 6, 2012, plaintiff was seen by Dr. Behroz Hamkar, M.D. See ECF No. 71 at 6, 52-3, 69, 75-6, 108-9. Dr. Hamkar noted that plaintiff had "a history of chronic shoulder pain bilaterally," and had previously received cortisone injections in his right shoulder. Id. at 6, 52, 108. Plaintiff reported that his left shoulder was bothering him, without numbness or tingling, but the pain was worse when plaintiff tried to lift his hand above his head. Plaintiff was taking ibuprofen and gabapentin "for his chronic pain" which he said "helps him somewhat." Id. Dr. Hamkar diagnosed "left shoulder acromioclavicular arthrosis and tendinosis," and recommended a cortisone injection in plaintiff's left shoulder AC joint, which he administered to plaintiff the same day. Id. at 6, 52, 108-9.

- The parties dispute the extent of plaintiff's shoulder injuries and pain prior to August 10, 2012. Plaintiff testified that he landed on his right shoulder during a fight in 2008. Pltf. Depo. at 68:5-6. He testified that he fell on his left side when he was playing basketball ball in 2007 or 2008, id. at 68:11-4:

> Not only my shoulder. My whole left side was messed up because I was playing ball, and I came down and I slipped. Even my left ankle was messed up. That was on my left side.

Plaintiff testified that he may then have iced his shoulder but did not get a diagnosis. Plaintiff has submitted the December 4, 2008 report of an x-ray to his left shoulder, prepared by Dr. James Carter Thomas at the request of Dr. Susan Pido, which sets forth the following negative findings, ECF No. 71 at 12:

> AP views of the left shoulder with the humerus in internal and external rotation reveal the general bone density to be within normal limits. No bony injury is seen. No soft tissue calcifications are noted. The joint spaces are well maintained. . . . Negative left shoulder.

- The parties dispute whether plaintiff was injured by the alleged conduct of defendant

on August 10, 2012 and, if so, the extent of that injury. Plaintiff testified that he was permanently injured by defendant's conduct. See Pltf. Depo. at 71:8-9, 14-8, id. at 72:7-12, 15-7:

> Less than 40 percent of movement. I can't go above my head, can't go behind my back. . . . When he [defendant] felt the pop [sic], seemed like something went through me. I felt it all the way down to my hand. They have – now I can't feel my left hand. They treating me with the physical therapy. . . . This is a permanent injury. . . .
>
> I [previously] got a temporary injury and on my left side, but not to this magnitude because when they shot me [with cortisone], they shooting me in the joint, man. You don't – that's not a temporary injury. That's a permanent [injury] in the joint. I feel it against my bone. That's how much it hurt. They shot me in the joint twice. . . . I didn't have any of that in 2012. It was just a minor swelling. Nothing was wrong with my joints.

- Plaintiff has submitted the following exhibits in support of his contention that defendant McCowan caused permanent injury to his left shoulder:

    - On February 23, 2013, plaintiff submitted a HCSR Form, stating, ECF No. 71 at 71:

        > I was & am a victim of excessive force on August 10, 2012. I was cuffed behind my back on that date. My arms were overextended above my middle back. I'm having a lot of pain in my left shoulder with minimal movement or use in it. I need medical treatment.

    - On February 25, 2013, plaintiff was evaluated by an RN, who noted plaintiff's complaints of constant left shoulder pain, on a scale of 6 out of 10, since being injured in August 2012 when he was cuffed behind his back. The RN noted limited range of motion in plaintiff's left shoulder on examination and referred plaintiff for a physician appointment and x-ray. ECF No. 71 at 70.

    - On March 6, 2013, a left shoulder x-ray was ordered. ECF No. 71 at 72. The x-ray, taken March 11, 2013, revealed the following, id. at 68:

        > There is no fracture seen. The glenohumeral joint is mildly narrowed. The acromioclavicular joint is mildly narrowed as well. There are no significant spurs or erosions, however. . . . No fracture or dislocation is identified. Mild narrowing present at both the glenohumeral joint, as well as the acromioclavicular joint.

    - In January 2014, plaintiff requested another steroid injection in his left shoulder. The examining physician, Dr. Jian Ma, M.D., agreed. Dr. Ma noted plaintiff's complaints

11

as follows, ECF No. 71 at 81, 97:

> Left shoulder pain. He has had chronic left shoulder pain for years and he had a steroid injection by another medical provider some time in 2012. He stated that injection provided quite significant pain relief for a long time. Recently his shoulder pain is getting worse. He denies new injury but he stated he had trouble sleeping on his left side because of shoulder pain. He requests another steroid injection.

On examination, Dr. Ma found, id.:

> Examination of his left shoulder showed no deformity. There was quite significant tenderness to palpation at his acromioclavicular joint and at the lateral aspect of his left shoulder. I do not see significant muscle atrophy but his range of motion is limited, particularly abduction. He is able to actively abduct his left shoulder to about 140 degrees and on frontal flexion he is able to actively flex to about 90 degrees. The Hawkins test is positive. Cross arm test is also positive. The empty can test is negative. Internal and external rotation of his left shoulder is very limited.

Dr. Ma made the following assessment/plan, id. at 81-2, 97-8:

> Left shoulder pain. I believe he has acromioclavicular joint arthritis and pain, and I also believe he has subacromial bursitis. For that I will bring him back in 7-10 days for another steroid injection.

See also id. at 73, 96 (Jan. 15, 2014 referral for steroid injection to left shoulder).

- On January 28, 2014, Dr. Ma administered a steroid injection to plaintiff's left shoulder. ECF No. 71 at 99-100.
- In 2015 and 2016, plaintiff continued to complain of left shoulder pain for which he received physical therapy. See e.g. ECF No. 71 at 63-7, 77-80, 83-5.
- A list of plaintiff's identified accommodation needs, prepared by Dr. Ma on June 9, 2017, includes "torn rotator cuff" of an upper extremity. See ECF No. 79 at 2.
- Defendant contends that plaintiff's injury was "*di minimis*, if any." See ECF No. 54-2 at 1. Defendant relies on the declarations of LVN Maalihan and Dr. Hamkar.
- LVN Maalihan examined plaintiff soon after the incident and avers in pertinent part, see Maalihan Decl. ¶¶ 7-8:

> 7. During my treatment of Baker on August 10, 2012, objectively, I did not find any injury to his left-shoulder. I did not find redness, swelling, or any other injury near Baker's left shoulder.
>
> 8. My diagnosis did not require any further follow-up by a doctor,

12

> but I informed Baker to submit a sick-call slip if any other left-shoulder issues arose.

- Dr. Hamkar was the first physician to examine plaintiff after the incident, and opines, see Hamkar Decl. ¶¶ 7, 9-12:

> 7. In reviewing Baker's UHR for the month following the alleged injury, I found that there were no medical complaints consistent with an exacerbated shoulder injury. It appears Plaintiff was suffering from a chronic shoulder injury prior to August 10, 2012, for which he was receiving occasional cortisone injections.
>
> 9. On August 13, 2012, Baker was seen in response to a Form 7362 request. After this appointment, Baker was encouraged to follow-up with medical staff if his injury or pain persisted. During this appointment, Baker indicated that his pain was where it was prior to the alleged incident with Officer McCowan. The treating nurse indicated that Baker should have a routine follow up with a physician.
>
> 10. By September 6, 2012, when I personally treated Baker, he made no mention of an incident on August 10, 2012. I did not note any worsening in his condition. Additionally, Baker has complained of bilateral shoulder pain in the past and has typically received cortisone injections. For his bilateral shoulder pain, Baker again received a shoulder injection.
>
> 11. Baker's treatment plan for his chronic shoulder injury was not altered in any way after August 10, 2012.
>
> 12. In conclusion, I found nothing in Baker's UHR at or soon after August 10, 2012, to corroborate his claims of a shoulder pop or exacerbation of a left-shoulder injury.

- Plaintiff commenced this action on January 25, 2015, when he filed the operative complaint. ECF No. 1.

V. <u>Excessive Force Claim</u>

A. <u>Legal Standards</u>

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not . . . use excessive physical force against prisoners." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (citing <u>Hudson v. McMillian</u>, 503 U.S. 1 (1992)). "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson</u>,

503 U.S. at 6-7 (citing <u>Whitley v. Albers</u>, 475 U.S. 312 (1986)).

When determining whether the force was excessive, we look to the "extent of the injury . . . , the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" <u>Hudson</u>, 503 U.S. at 7 (citing <u>Whitley</u>, 475 U.S. at 321). Although "the extent of injury may . . . provide some indication of the amount of force applied," "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 37 (2010) (quoting <u>Hudson</u>, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind. An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim. [¶] Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts." <u>Wilkins</u>, 559 U.S. at 37-8 (citations and internal quotation marks omitted).

B. <u>Analysis</u>

Defendant moves for summary judgment on plaintiff's excessive force claim on the ground that it is unsupported by admissible evidence and because plaintiff "suffered a *de minimis* injury, if any" as a result of defendant's alleged conduct. ECF No. 54-2 at 1, 4. Defendant argues that "the undisputed evidence shows that Plaintiff has long suffered from diagnosed arthrosis and basketball injuries to his left shoulder." <u>Id.</u> at 1. Defendant further argues that the record "reflects no objective injury, only Baker's subjective complaints," and that there is no evidence of injury consistent with a shoulder "pop." <u>Id.</u> at 4.

Plaintiff moves for summary judgment on his excessive force claim on the ground that it is supported by admissible evidence and because plaintiff suffered more than *de minimis* injury because he has suffered "a permanent left shoulder injury." <u>See</u> ECF No. 71 at 1. Plaintiff argues that, even if his injury was *di minimis*, defendant's use of force was excessive and malicious under Eighth Amendment standards. <u>See</u> e.g. ECF No. 71-1 at 12.

The court initially notes that a pro se litigant's evidence, if not admissible as submitted,

14

must nevertheless be considered on summary judgment if the evidence could be made admissible at trial. See n.2, supra.

However, the record evidence does not foreclose plaintiff's excessive force claim. As defendant concedes, in opposition to plaintiff's summary judgment motion, material factual disputes remain concerning "the cause of the alleged injuries," "the force applied," and "whether Defendant McCowan would have known that Plaintiff had a waist-restraint chrono or whether the emergent circumstances would have allowed time for him to retrieve waist chains." ECF No. 74 at 4-5. These material factual disputes preclude summary judgment.

Recognizing the inability to resolve these matters on the present record, defendant argues that plaintiff's injuries, if any, are no more than *di minimis*.[8] While the absence of serious injury is relevant in assessing an Eighth Amendment claim, it is only one factor. As the Supreme Court held in Hudson:

> Under the Whitley approach, the extent of injury suffered by an inmate is one factor that may suggest "whether the use of force could plausibly have been thought necessary" in a particular situation, "or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and "any efforts made to temper the severity of a forceful response." The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

Hudson, 503 U.S. at 7 (quoting Whitley, 475 U.S. at 321). The Supreme Court emphasized that "[t]he 'core judicial inquiry' . . . [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good faith effort to maintain or restore discipline, or

---

[8] Defendant relies on the "expert" opinion of Dr. Hamkar, one of plaintiff's treating physicians, which the undersigned finds to be unduly biased in light of the record as a whole. See e.g. Hamkar Decl. ¶ 7 ("there were no medical complaints consistent with an exacerbated shoulder injury"). It is clear that plaintiff complained of a left shoulder injury and increased pain following the August 2012 alleged incident, underscored by the fact that both Dr. Hamkar and Dr. Ma thereafter administered steroid injections to plaintiff's left shoulder (in September 2012 and January 2014, respectively), without prior record evidence that plaintiff previously received such injections in his left shoulder.

maliciously and sadistically to cause harm. When prison officials maliciously and sadistically use force to cause harm,' the Court recognized, 'contemporary standards of decency are always violated . . . whether or not significant injury is evident.'" Wilkins, 559 U.S. at 37 (quoting Hudson, 503 U.S. at 7, 9) (citing Whitley, 475 U.S. at 319-21). "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts." Wilkins, 509 U.S. at 38.

Therefore, to assess the merits of plaintiff's excessive force claim, the nature and extent of plaintiff's injury must be considered together with defendant's need to use force and the amount of force applied. The current record does not resolve these material factual disputes.

Nor does the record resolve the parties' dispute concerning the location of the alleged incident and whether that location was effectively monitored at the subject time. Plaintiff contends that the alleged conduct took place out of view of other staff members and cameras. Defendant contends that, although plaintiff's description of the location of the alleged incident has changed, no relevant area is unmonitored. However, defendant's evidence does not resolve this.

Defendant relies on the declaration and exhibits submitted by ISU Sergeant Steele, which are intended to "accurately depict the grounds on Facility C, at CSP-SAC." Steele Decl. ¶4. Defendant relies on this information to generally conclude that "[t]here is no area on Facility C medical, or near the Program Office, that is unmonitored." DUF 19; see also Df. MSJ, ECF No. 54-2 at 3 ("A review of the photos reveals that the holding cage and all facets of the escort were visible to the Watch Office, the law library, the Pedestrian sallyport/breezeway, or the staff in the medical clinic."). Neither Steele nor defendant inform the court whether these areas are monitored by cameras as well as by correctional staff. Monitoring by correctional staff can be compromised by distractions and temporary absences. Camera monitors must be fully functioning and their views unobstructed. Defendants' evidence does not clarify whether the putative locations of the alleged incident occurred in an area that was monitored in fact.

For these several reasons, the undersigned finds that the current evidentiary record, whether viewed in the light most favorable to plaintiff or defendant, does not resolve the parties' material factual disputes. Accordingly, the undersigned recommends that summary judgment on

plaintiff's excessive force claim be denied to both plaintiff and defendant.

VI. Deliberate Indifference to Serious Medical Needs Claims

The complaint alleges not only that defendant failed to adhere to plaintiff's medical chrono for frontal waist restraints, causing injury, but that defendant "prevent[ed] plaintiff from receiving his doctor ordered prescribed insulin shot" by the "forceful removal from his designated scheduled Diabetic Care Appointment." ECF No. 1 at 18, ¶¶ 45, 47. On screening the complaint pursuant to 28 U.S.C. § 1915A, the court found these allegations sufficient to state two separate claims for deliberate indifference to serious medical needs. See ECF No. 10 at 7-8, n.2 and related text.

A. Legal Standards

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (internal citations, punctuation and quotation marks omitted). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)).

"In the Ninth Circuit, the test for deliberate indifference consists of two parts. First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong ... is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations, punctuation and quotation marks omitted); accord, Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Lemire v. CDCR, 726 F.3d 1062, 1081 (9th Cir. 2013).

17

To state a claim for deliberate indifference to serious medical needs, a prisoner must allege that a prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," evidence must exist to show the defendant acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 297 (1991) (internal quotation marks, emphasis and citations omitted).

Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. The inference of knowledge from an obvious risk has been described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability by virtue of their having turned a blind eye to facts or inferences strongly suspected to be true . . . ." Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995) (citing Farmer, 511 U.S. at 842-43) (internal quotation marks omitted).

When the risk is not obvious, the requisite knowledge may still be inferred by evidence showing that the defendant refused to verify underlying facts or declined to confirm inferences that he strongly suspected to be true. Farmer, 511 U.S. at 842. On the other hand, prisons officials may avoid liability by demonstrating "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844. Thus, liability may be avoided by presenting evidence that the defendant lacked knowledge of the risk and/or that his response was reasonable in light of all the circumstances. Id. at 844-45; see also Wilson, 501 U.S. at 298; Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

////

////

B. Analysis

1. Insulin Injection

Plaintiff testified that in August 2012, he received one daily insulin injection, at 3:00 p.m. during "med pass." Pltf. Depo. at 16:19-21. Significantly, plaintiff also testified that "it is possible" he actually received his insulin shot on August 10, 2012. Plaintiff explained, id. at 25:13-16:

> It is possible Joe gave me the shot, and – it is possible. Like I said, it all just happened so fast. It was totally unexpected. And I'm being honest. I don't remember. I really don't remember.

This concession, together with the absence of any record evidence or argument to the contrary, compels the conclusion that summary judgment on this claim be granted for defendant. "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See Celotex, 477 U.S. at 322.

2. Medical Chrono for Frontal Waist Restraints

The parties dispute whether defendant was aware, or should have been aware of/inquired about plaintiff's medical chrono for frontal waist restraints before he cuffed plaintiff behind his back. Plaintiff avers that he told defendant; defendant avers that plaintiff did not. Defendant further avers that "even limited mobility inmates can still be escorted with proper bodyweight support, despite being handcuffed behind the back." McCowan Decl. ¶ 9. However, the parties dispute whether defendant accorded plaintiff "proper bodyweight support" during the escort. Hence, the parties' respective sworn declarations and supporting evidence are directly contradictory concerning whether defendant acted with a "sufficiently culpable state of mind," Wilson, 501 U.S. at 297, that is, whether defendant "knew of and disregarded" an excessive risk to plaintiff's health or safety when he cuffed plaintiff behind his back, Farmer, 511 U.S. at 837. These questions must be resolved by a trier of fact. "'[T]o proceed to trial . . . all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" T.W. Elec. Service, 809 F.2d at 630 (quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)).

For these reasons, the undersigned finds that summary judgment on plaintiff's deliberate indifference to serious medical needs claim, premised on defendant's failure to adhere to plaintiff's medical chrono for frontal waist restraints, should be denied to both plaintiff and defendant.

VII. Conclusion

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1. Summary judgment be entered for defendant on plaintiff's claim that defendant was deliberately indifferent to plaintiff's serious medical needs by causing plaintiff to miss his August 10, 2012 insulin injection.

2. Summary judgment be denied to both plaintiff and defendant on plaintiff's remaining claims.

3. This action proceed on plaintiff's remaining claims against defendant McCowan for: (1) the use of excessive force, and (2) deliberate indifference to plaintiff's serious medical needs premised on defendant's failure to abide by plaintiff's medical chrono for frontal waist restraints.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one (21) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." **No extensions of time will be granted, due to exigencies of time within the court.** The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 27, 2018

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE